Ladies and gentlemen, our first case for argument is the Illinois League versus the Department of Health and Human Services. So, Ms. Sherwin. Good morning, your honors. My name is Judith Sherwin. May it please the court. I represent the guardians who are the plaintiffs' appellants of the residents of Illinois State Operated Developmental Centers who oppose mass transition to the community pursuant to a state plan known as a rebalancing initiative, which we believe violates Part 2 of the Americans with Disabilities Act, Section 304 of the Rehabilitation Act, which is basically the same standards and review, and the Medicaid statute requiring as an entitlement freedom of choice for a full gamut of Medicaid services under 42 U.S.C. 1396 N.C. 2C. A little history about the case. Following the entry of a temporary restraining order in June of 2013, in which the court found that the transition process, which was currently underway in the Murray Developmental Center, was causing serious and irreparable harm to residents who had been transferred out, the court set an evidentiary hearing for consideration of a preliminary injunction hearing. The court indicated in several rulings prior to the time of the evidentiary hearing that he wanted the hearing to focus on certain issues with respect to the ADA. He indicated that he wanted to see the proof revolve around the question of whether there was intentional discrimination, whether there was a violation of reasonable access for the residents, and whether there was a disparate impact between two sections of developmentally disabled persons in Illinois. How many residents are there now in Murray? Your Honor, I believe there are currently 224 residents in Murray. What's the capacity? The capacity is, I believe, well over 300. At the time that the litigation began, I believe it was somewhere around the 250 range, because the center had a continuing program in place where residents who were in the facility were evaluated on a yearly basis in order to determine whether or not they were appropriate for transition to the community, which is one of the three legs of the Olmstead analysis provided by the Supreme Court. I believe at one time at its height, Murray had over 300 residents at the time of the litigation. It was down around the 250 mark. What was the purpose of seeking a preliminary injunction here, rather than just proceeding in the usual way, do the whole litigation? Why preliminary? What's the urgency? Well, the urgency at the time, Your Honor, was that in spite of the fact that there was a temporary restraining order in place, the state insisted on continuing to assess residents for transition to inappropriate placements in the community over and above the objections of the guardian. In the summer, immediately prior to the preliminary injunction, the state started pulling the records of all of the residents on a sort of continuing basis, beginning in August, in order to assess these residents on a preliminary basis to try to continue to transfer them out of the community. There was evidence presented at the hearing that this was to be done in spite of objections of the guardians. In fact, the guardians objected strenuously to the records being reviewed and had notations in the file that had been placed in the file back in September of 2012 saying, you may not review my ward for transfer to the community because they are inappropriate to do so. Not only may you not review them, but the process which you have described to us, whereby you will be transferring them to the community, is inappropriate and therefore you may not evaluate and look at the records of our residents. In spite of that notation, which was on the files, the files were taken by the state's appointed contractor and were reviewed to continue this transition process, which as I say was over and above the objection of the guardian. Now at trial, at the evidentiary hearing, the state made a showing that they would never transfer residents out of these facilities without guardian consent when in fact they were just moving along on their process to continue the possibility of transfer. Why is that harmful? Why is the assessment process harmful? Well, the assessment process is harmful, Your Honor, because once a DD resident has gone through an assessment that finds them inappropriate for state-operated developmental disability services, which are provided at a state ICFMR, which is what an SODC is, they are no longer... I'm sorry, your acronyms are nearly incomprehensible on that one. ICFMR is Intermediate Care Facility for the mentally, it used to be Mentally Retarded, not referred to that way anymore, but in any event, the ICFMR services which are provided at a state-operated developmental center are not provided anywhere else. There is another category of service called Intermediate Care... I understand, counsel. Counsel, I understand that you and your clients object to an actual transfer. We've got district court findings that that is not happening over objections of guardians, but I don't understand the need for an injunction to prohibit the state or its contractors from assessing patients and their appropriate levels of care and facilities for purposes of discussion. Well, Your Honor, it's not for purposes of discussion, it was for purposes of transfer. But not being transferred. The question is whether there's irreparable harm that would justify the... One question, whether there's irreparable harm that would justify the issuance of a preliminary injunction. Well, Your Honor, there was in place, until the order came out in July of 2014, a temporary restraining order which prevented the irreparable harm. Well, wait a second, I don't understand. What did the temporary restraining order restrain? It restrained the transfer of residents... But no one is being transferred. Well, they were being transferred. Well, they're not being transferred now, right? Because the temporary restraining order was in place, but a temporary... Yes, but look, there's no preliminary injunction, but nobody is being transferred. Only because the TRO was in place. Once the TRO was no longer in place, the state would be free to transfer. Wait a minute, look. Counsel. The temporary restraining order is not in force. There's nothing, there's no temporary restraining order, there's no preliminary injunction. The question is, what is the irreparable harm that would justify the entry of a preliminary injunction? The irreparable harm, Your Honor, is that there could be a resumption of this process because... If they start transferring, you can ask for your temporary restraining order, preliminary injunction. But as long as they don't transfer people, what is the harm? What is the irreparable harm? Well, Your Honor, in answer to that, other than the transfer, an assessment... Would you forget the transfer because they're not being transferred? Okay, so I said, Your Honor, other than the transfer. We'll forget the transfer for the moment. The assessment of a state-operated developmental center resident which finds that they are not appropriate to receive that level of services is something which goes into their record and in the future makes it more difficult and perhaps impossible for them to ever get state-operated developmental center services again. But how can an assessment create irreparable harm? If the assessment is inaccurate, then any attempt to rely on it would be appropriately challenged. The assessment, once it's in the client's file, creates a presumption which is very difficult to overcome. Why is it difficult to overcome? Because the admission for ICFMR services in the state-operated developmental centers is not an easy process. It is a process that is very difficult, and it is very difficult to obtain admission to one of these centers. Once there is something in the record that indicates that the potential resident in any way does not qualify, the whole system that is set up to determine services for these kinds of residents is going to find that they don't belong in a state-operated developmental center and they are going to put them somewhere else which will be inappropriate, at which point they will receive services that are not appropriate to their condition and which can result in all sorts of deteriorations in their condition. But all that is in the future, and all that could be addressed in a final judgment. I don't understand the urgency of preliminary injunction. If you prevail in the litigation when it finally ends, then all those assessments will be torn up, right? That's correct, but in the meantime... And no one will have been transferred in the meantime. Not at the present moment. There is no... Look, no one will be transferred. They are not transferring until there is a final judgment. Well, there is nothing to prevent them from transferring until there is a final judgment. There is no TRO. There is no preliminary injunction. So you think that if... They could go back and start doing it again. Well, did they start transferring when the preliminary injunction was denied? No, they didn't because there was an election going on and the state was in somewhat of a disarray, which it is still in. What are the state's current intentions? What have they told you? They are unclear and they have not really told us anything other than they wanted to come here and oppose the preliminary injunction. Could you just specify exactly what relief you are seeking at this point, please? What relief we are seeking is that the process which was in place at the time that we filed the appeal, namely the process whereby the residents were being assessed... You want to stop the assessments. We want to stop the assessments. We want to stop that process so that if in the future... Okay, but I don't want the full argument. I want to know exactly what relief you are seeking. Stop the assessments. Stop the assessments. That's correct. Anything else? Well, that's the point at which that's what was going on at the time that the hearing for the preliminary... Okay, I thought you also sought an injunction blocking transfers over the objections of parents or guardians. Well, we were also... If the state had stopped doing that... Counsel, is that correct? Yes, it is correct. You were seeking that relief. The district judge found there's no need for that because it's not happening, right? He found there was no need for that because he found that the state was affording choice to the guardians. Right, but it's not happening. And we believe that they were not affording choice. Okay, why is that finding of fact clearly erroneous? We believe it's clearly erroneous because we had a plethora of evidence in the record to show that every one of our guardian witnesses and the staff whose affidavits were in the record uncontested indicated that the state had told them unequivocally that there was no choice, that the process was going to continue, and that transfer would happen even over the objection of the guardians. Okay, and there was conflicting evidence with that, correct? There was conflicting evidence. Okay, so why is the district judge's finding clearly erroneous on that conflicting evidence? We believe that the weight of the evidence favors the finding of no choice rather than a choice. And I understand that this is a very heavy burden to bear in this court, but, Your Honor, there was a tremendous amount of evidence that choice... I find the idea of stopping an assessment absurd. It's information. They're getting information. If it's wrong information, if their analysis is wrong, well, it certainly can challenge that. Why do you want to stop them from producing information? Well, they're not just producing information. What's the harm? It turns out to be inaccurate information. Well, then they won't be allowed to act on it. Your Honor, I'd like to reserve a minute for... Excuse me, Judge Posner. Yes, go ahead. I'd like to, just if I could, counsel, see if I'm understanding your discrimination theory under the Americans with Disabilities Act, because if I understand it correctly, it seems more like a claim that the state is failing to differentiate sufficiently between different groups of disabled folks based on their degree of disability. Is that right? That's part of it, Your Honor. What they have done is they have decided that people in SODCs, who are the most profoundly and severely disabled, are going to be handled in one way, and they are going to be assessed for transfer into the community and deprived of the services they're currently getting in SODCs, whereas other developmentally disabled persons who are in the system or even out of the system are not going to be assessed by the same process. But they're already in community-based centers, right? No, they're not. Some of them are not even in the system. Some of them are at home. Well, but why are your clients being treated worse than people who are being provided services only in their own homes? Because they want to get them out of SODCs, and they want to close SODCs because there is an ideological idea that people outside of SODCs do. Right, right, right. But my concern is it sounds more like an argument that the state is treating everybody too similarly, failing to take proper account of the truly profound disabilities that your clients are suffering from. Well, that is part of the problem. They are not following what they say is the requirement of Olmstead. They are not making an assessment as to whether or not the people in SODCs are able to come into the community. Okay, but I don't understand how that's a discrimination argument. I understand it may be a mistaken policy. I understand the Medicaid argument that you're making, I think, but I don't understand how it's discrimination. Well, we believe it's discrimination because the only people who are going through this assessment are the SODC people. This assessment policy that was provided in this transition plan was not applied to anyone else. No, because it deals with the SODC facilities, right? I mean, I don't understand. Well, it does deal with the SODC facilities. Couldn't the state abolish all these SODCs? They could if they do them in the right way. What does that mean, the right way? They could just say apparently there's a lot of opinion that these community-based facilities are better. So suppose a state decides, yeah, we agree with that, and incidentally it's cheaper and what have you, and so they get rid of all their SODCs. Would that violate the Constitution? I don't think it would violate the Constitution, Your Honor. I believe it would violate 42. What would it violate? It would violate 42 U.S.C. 1396 N.C. 2C. Well, wait a second. What exactly would the violation be? The violation would be that that section of the Medicaid statute provides for a full gamut of choices for persons with developmental disabilities and their guardians, and the full range of choices includes institutional care at one end and home-based services at the other. So you think the statute actually requires institutional care even if a state, even if all the states decide, no, putting these people in institutions is bad for them as well as needlessly expensive. You don't think the state can say that without violating federal law? I don't think the state can say that without making institutional ICFMR services available. It's not necessarily where they're provided, but those services must be provided, and the statute itself talks about long-term care facilities as one of the choices that is required to be available for these. So you think the federal statute requires every state to have these SODCs? They require a place. Do you say yes or no? Yes, I do. Well, Indiana doesn't have any anymore. I'm sorry, Your Honor. I don't think Indiana has any more. Are they in violation of federal law? I don't know whether they are or not, Your Honor, and if they don't have them anymore and no one has challenged it, I couldn't really answer that question. I thought what you were actually telling us a moment ago was not that the state is required to own and operate these large SODCs, but they're required to provide appropriate levels of service, regardless of location. That's correct. Under that theory then, would it be permissible to close all of the SODCs as long as appropriate services are being provided elsewhere? As long as appropriate services are being provided elsewhere. It was our evidence submitted that in the state of Illinois, such appropriate services were not being provided elsewhere. Not even offered. In our decision-making, do you think we should be worried about the people who are on the waiting lists for all these facilities? No, I don't at this point. Why not? Because they are not in the system. Their needs may be as great, right? Their needs may be as great, but they are not in the system. They need to be evaluated. And if they are able to be cared for in a different setting, that is something that the state has an obligation to do. And if those people who are out of the system require the same ICFMR services, which were previously available in state-operated developmental centers, then they ought to be eligible to receive those services. What would be an example of a service that could only be provided in an SODC and not in a community-based facility? Well, we identified a number of them, but one of the two that came to the fore constantly was the issue of the availability of 24-hour nursing care, which is available in a state-operated developmental center and which is also available in something called an ICFDD, which is a potential substitute place for such services to be provided and which were not available to my clients at the time. Because my clients were told they could not get the services that they were getting in an SODC. They had to go into the community to two- to four-bed community-based services. So 24-hour nursing care is not something that was going to be available. The other thing that was not going to be available was the issue of one-on-one care. Certain of the residents of SODCs require to always be with a one-on-one person. Someone has to be there within arm's length all the time to prevent them from hurting themselves or someone else, and this would never be available in community-based settings. Why do you say it would never be available? There are plenty of people who live at home and have 24-hour care. Living at home and having 24-hour care is not the same thing as having one-on-one. One-on-one means if there are two people in the room, there is one staff devoted to one resident, and if the other resident is having a problem, they can't divert their attention from the person they're supposed to be one-on-one with in order to take care of the other person. There was no situation that the state offered where there was going to be that availability. At the most, you would have two staff members and two to four residents. There is no way that one of those persons was going to be one-on-one, because if they were, then the other two, the other one, or the other two, or the other three had no one to take care of them, and that was never going to happen. It's a question of an impossibility of being able to provide that kind of care unless you want to have one staff member devoted to every person who is in the community, and that's certainly not something that the state is ever going to want to pay for or that's even possible to do. Okay. Thank you. Thank you. Do I still have my one minute? Sure. Thank you. Mr. Legner? Good morning, Your Honors. May it please the court, counsel, Brett Legner for the defendants. Your Honors, this court should affirm the decision of the district court denying the plaintiff's motion for a preliminary injunction. Because the district court's extensive fact findings were not clear error, the court did not abuse its discretion in balancing the preliminary injunction elements. On appeal, plaintiffs have forfeited any claim of irreparable harm anyway, and there's no likelihood of any success on the merits of any of plaintiffs' claims. Just starting with a couple of factual misrepresentations from the very end, Your Honor, first regarding to the provision of one-on-one care in a community placement. There is certainly evidence in the record, and this is at page C3994 of the record, in fact, that some people placed in community arrangements, SILAs, receive 24-hour one-on-one or even two-on-one care. It's certainly not true that an individual cannot receive one-on-one or two-on-one care in a community placement. We have evidence in the record directly to the contrary. I assume all the assessment process identifies those people specifically, right? There's not any question who's one-on-one or maybe even two-on-one. That's easily counted because they're in that situation, right? Yes, yes. The assessment process, and I would indicate that plaintiffs all refuse to participate in the assessment process, the new assessment process, but yes, an assessment process that would be identified and those services would be provided. Absolutely. Additionally, no one was told that they must go into the community. Insofar as there might have been some statements that were construed to mean that, they were also explicitly told that no one has to go into a community placement without guardians' consent. Repeatedly, going back to September 2012, there's evidence in the record of a transcript in which there was a public meeting at which many of the actual plaintiffs were present where they were told, you do not have to accept a community placement. You can go to an institutional setting. They were told repeatedly after that in emails and the testimony at the preliminary injunction hearing all indicated that nobody has to go to a community placement. Even when confronted with this fact at the actual preliminary injunction hearing, the plaintiff's witness says, well, we didn't believe them. We didn't trust their body language. But the fact is that the evidence in the record shows that nobody has to take a community placement. Nobody would be transferred from Murray Center without the guardians' consent. But you're planning to close Murray, aren't you? At the time the process was undergoing, Murray Center under the rebalancing initiative was slated for closure. But that means that some of these people, will they all go into community-based facilities? No. No, but if they're moved to SODCs that are in a remote part of the state, that's very inconvenient for their families, right? It may be less convenient, but it's not a violation of federal law. There's no theory that. In fact, courts have rejected any notion that you're entitled to a placement in a specific facility within X miles of where you live. But I also want to make clear a point that I think might have been getting lost a little bit earlier. There is a difference. The broad differences in types of placement are institutional settings, that are an issue here, are institutional settings and community settings. Within the institutional setting category, there's two categories. There are the state-operated SODCs, but then there are the privately-operated ICFDDs. But don't you have to pay for those? Well, the Medicaid, and this is under the Medicaid statute, the Medicaid waiver statute for the community placements, it's covered. Medicaid will pay for those private? Yes, yes, absolutely. Does the state still want to close Murray? Your Honor, there are currently no plans to close Murray Center. So what do you think we need to decide and why? Your Honor, I think that you need to decide that a preliminary injunction is not warranted in this case because there is no irreparable harm that plaintiffs face. There's no urgency. There's no need to enter a preliminary injunction. Well, there are different kinds of reasons for that. There are. One would be the kinds of reasons the district judge gave. It would be very different if a preliminary injunction is denied simply because the state no longer plans to go forward. That's true, Your Honor. But I think because the state currently does not plan to go forward, shows that there's no urgency justifying the preliminary injunction. That's reason one. Reason two would be nobody's being transferred without guardian consent, so there's no reason to do it. Reason three would be their assessment theory, just simply going through an assessment is not an irreparable harm. It's not anything that's not fixable. It's not anything if the assessment is incorrect and results in an incorrect characterization of services. That's not irreparable by any stretch. And all this under the umbrella that they forfeited the issue on appeal anyway. So for those four reasons, Your Honor, I would suggest that this Court affirm the denial of the preliminary injunction for the failure of irreparable harm. Is it ultimately going to be the majority of the people trying to get into the community setting? There's an old thing they used to call group homes. Is this similar to that, or is this something else? These community settings are generally one to four or two to four bedroom apartments or houses. There's somebody living there that monitors it 24 hours a day? They're staffed, yes. And the number of staff that are present at all times depends on the needs of the residents. This is all very person-centered, all the planning. Everybody's assessed and a determination is made. How much care do you need? How much staff is needed to provide that care? And then they're directed to a proper place that can provide that specific staffing. So one of these community places will have any number of employees present and at different times to provide the care that's required. Would the private locations be something similar to a nursing home? Well, these, Your Honor, as opposed to a typical nursing home, those are bigger institutional level. And broadly speaking, because it's not exactly a term of art, but those are the broader big institutional placements. These are smaller apartment, a house. So that's not counted as far as whatever you're talking about? Correct. That would be more along the lines of the private institutional level that they could transition into instead of a community. Well, that's the other side of it. You said there are two categories. That's the other side. Yes. Yes. That's exactly right. But when the Jackson – Counsel, I don't understand. We're being told that this is supposed to save money, right? That is one of the reasons for doing it. Right. But I guess I just don't quite understand how a lot of very small facilities that need 24-hour staffing at various levels are cheaper to run than one where in the dead of night there may be – maybe you can get away with a thinner staff, but there is a nurse on duty, for example, to deal with crises. I understand. And there was some testimony in the record working on the way the budgets break down, and there was some sense to that. But it comes down to, I think, the bigger point that there is a trend away from the bigger facilities, even aside from just pure monetary savings, pursuant to Olmstead, pursuant to just – I understand that policy point, but I don't – I guess I'm – well, I haven't seen it in detail, but I don't understand the economic case. Without being glib, it is complicated. Again, there was expert testimony in the record about the way the economics does break down. But yes, it certainly stands to reason that you're going to lose some maybe efficiencies by going this way, but you make up for it in other ways. Plus you have the quality of life enhancements from a community emplacement. Ultimately, Your Honors, turning to the likelihood of success and the merits, plaintiffs admit – they make no pretense that they're asking this court to second-guess the district court's factual findings. They specifically say this court should second-guess the district court's factual findings. But they make no effort to acknowledge or reconcile the overwhelming evidence in the record that, in fact, nobody would be transferred from Murray Center without guardian consent. Isn't it – I thought you were going to try to reduce it from seven to three or four places like Murray. Yes. So ultimately – yes, Your Honor. So going to that point, assuming that Murray Center does fully close, yes, people at that point will have to be transferred. And the state did this with – the other facility I specifically mentioned in the rebalancing initiative was a facility at Jacksonville, Illinois. And that fully closed. And people were, with guardian consent, transferred to some community placements, other SODCs, or other private institutional-level cares. Some people would not consent to anything. And because the lights were going to be turned out and the doors were going to be locked, they, at that point, needed to be transferred. So they were transferred to similar SODCs, so the same type of facility. My point is you've already got experience with this process. Yes. So it's not a matter of guessing what's going to happen. It's if it's already happened someplace. That is correct, Your Honor. I think Jacksonville is instructive. But more to the point, with regard to these specific plaintiffs, they will not be transferred to community placements if their guardian says no. It will not happen. Nobody will be put in the community if the guardian does not consent. The record's clear on that. And for that reason, all of their claims, all of their claims fail in the merit because they're not being denied choice. They're not being denied any services pursuant to this plan. Was Ms. Sherwin-Wright, that there are more than 200 residents still in Murray? Yes. How large is the staff? I don't have those numbers on me right now. It is a large staff. I can certainly say it's in, you know, because it's a large campus that is made up of, I believe, 17 different buildings. And so there's, you know, some staff in each building. It's a very sizable workforce. Plus 24 hours. Yes. Yes, it is a sizable around-the-clock workforce. So why should we not just decide this case on two simple grounds? Assessment itself is not irreparable, and the state no longer plans to close Murray. Those simple grounds justify affirming the district court's decision. That is, yes. Without trying to evaluate whether the state could close Murray in the future? You may not, you don't intend to close it during the litigation? Not that you never, not that you intend never to close it. There are currently no plans to close it. But you foresee eventually closing it. It is definitely possible. I cannot stand here and say that the government never intends to close Murray. I cannot. But it sounds like what had been a plan by the prior administration has now become a more academic question in the courts. Presently that is true. So why should we decide it? Insofar as they, well, it is on this preliminary injunction, because we're up here on interlocutory appeal, just at this preliminary injunction stage, and the fact of any, the lack of any immediate irreparable harm right now would, as a result of this, would justify not deciding that and entering the order affirming on that ground. That is true. The fact is the state is certainly not saying it will never close Murray Center and that it won't take steps to do so. It's just not currently planned at the moment. So it is a somewhat, I guess, difficult timing-wise situation. Now, because this is on, for this court, on an interlocutory appeal, I think it's certainly appropriate for this court to say, there's no current plans right now, nobody's being transferred, we don't have to decide this, and it goes back to the district court. And then if there needs to be factual development on what the actual plans for Murray Center are when the district court is deciding the merits, that is appropriate to the result in the district court. What you're describing, though, is a situation in which there are no merits to be decided. I mean, if assessment does not cause irreparable harm or violate federal law and the state no longer intends to pursue the policy of closing Murray, what does Judge Aspin have to do? I think that Judge Aspin would need to resolve the extent of the disinclination to close Murray. I think there would need to be some kind of factual development. I can stand before you and tell you that there are currently no plans to close this center. I cannot stand before you right now and tell you that the state will never try to close it or that the state's plans won't change tomorrow. There are currently no plans, but I can't give you any limit on that. I personally, that might need some factual development before Judge Aspin, and then he can then determine whether to get into the merits. I assume Murray would be the first one to go, is it, of the seven? Well, Jacksonville's already gone. Yeah. I'm sorry, was that one of the seven? Yes. Oh, okay. And so then Murray would be, Murray and Jacksonville were the two that were named specifically in the rebalancing initiative. There's still the goal of the overall census reduction amongst all the SODCs and the effort to give people community placements, but Murray was the other facility I specifically named. Okay. Counsel, how many people are qualified and eligible for services for the appropriate category of disability here and who are still on waiting lists? Over 20,000. Do you think that should figure in our evaluation of the case at all? Well, for instance, in this court's Bertrand decision, it acknowledged that the state has to make decisions on how to allocate resources and it is not going to and does not violate federal law for the state to do that. So, yes, I do think that this court should be cognizant of a huge waiting list and the state's effort to maximize its resources and to allocate them to the largest population possible I do think is relevant. Thank you. If this court has no further questions, then I ask that you affirm the decision of the district court and thank you very much for your time. Okay. Thank you, Mr. Miller. Ms. Sherwin, you have another couple of minutes. Your Honor, very quickly, I'd like to clear up one point about the gamut of services that are available. ICFMR services are only available at the state-operated developmental centers. They are a higher level of service. They require a higher level of staff. The ICFDD services are similar in the sense that they are institutional services, nursing home-like services, but the staffing is at a much lower level and ICFDDs basically have the ability to say we will not take this resident. SODCs have a very, very limited ability to say that. The other thing, and I wasn't sure I understood counsel's answer, I think, and maybe I didn't understand the bench's question, Your Honor's question, the number of persons waiting for services in the entire developmental disability program, I believe, is 20,000. I don't think there are 20,000 people waiting for the ICFMR services, which are available at SODCs. So I think that is a bit different, and that was one of our elements of what we felt was discrimination because the people who were in need of services were undergoing an entirely separate process of evaluation than we were. We felt that the process of evaluation which was used for our residents was only geared for the sole and purposeful reason of being able to close the ICFMR services available to them. Was 42 U.S.C. 1396 the statute you mentioned? Yes, 1396 NC2C. And what is it in that statute, did you think? That statute, Your Honor, is the Medicaid waiver statute, which provides for the waiver is the idea that the funds which were previously only to be used in institutional settings. I don't see anything about community-based services or institution care. It mentions community-based care. I don't think it creates a right to a hospital. The statute itself talks about a person who would be in need of long-term care services or hospital services. Yes, but it doesn't say that it has to be provided in an institution. Well, it indicates that the services available in those places could be that the resident in need of those services could choose. Yes, they have to be adequate services, but there's no suggestion of a preference for the large institutions over community care facilities. I don't believe there's a suggestion of a preference. There's a suggestion of a choice. I don't see anything in the statute that supports your view that somehow it would be discriminatory to say to someone that you're being transferred to a community-based facility. Because the question is whether the community-based facility will provide the services that the person needs. Well, Your Honor, the evidence that we showed at the hearing was that the community-based service did not provide them. Well, that's a separate point. I'm just saying I don't understand what the statute does for you, except to indicate that these people are entitled to service, but it doesn't say where they're entitled to the service. It says they are entitled to make a choice between all of these different levels of service. No, that's not in the statute. Well, Your Honor, I believe it is, and I believe that the cases that we have cited to the court, namely the case out of Pennsylvania, the McGriff case, which indicated that a real choice had to exist for institutional services in order for that statute not to be violent. I don't understand that. If the services provided in a community-based facility, and the quality of the people and the quality of the nurses and the this-is-and-that's, if that's equal to what you would get in an SODC, why would it be prohibited? We believe that the evidence showed that they would not be equal. That's a separate question. Then I don't understand your question, Your Honor. That's a separate question from anything to do with the right to choose a particular facility. Not a particular facility, a particular level of facility, any particular place. No, it's services, not facilities. Well, but the services can only be provided in the facility. Well, that's an issue. That's a factual issue. That's correct, Your Honor, but the court did not find that the services could be provided anywhere. There's no categorical right to be in an SODC. Not a right to be in an SODC, but a right to choose from the full range of services, and our contention is that right to choose that level of service was denied to our plaintiffs. That's a separate issue from SODC versus other facilities, right? Well, Your Honor, for the reasons that we have stated, we are hopeful that you will be able to overturn the court's decision and find a necessity to protect our residents from having to go through this process and be transferred pursuant to this process in the future. Okay. Well, thank you, Ms. Sherwin and Mr. Legner. Let's move on to our second case.